Town *v.* Bank of River Raisin.

REUBEN TOWN *v.* THE PRESIDENT, DIRECTORS AND COMPANY OF THE BANK OF RIVER RAISIN, CHARLES NOBLE, HARRY V. MAN, LEWIS A. HALL, AND HENRY N. WALKER, ATTORNEY GENERAL.

An act of incorporation being a compact between the state and the corporators, the corporation cannot dissolve itself, by its own act merely; but a dissolution can only be effected by the assent of both of the parties to the compact, or by the judgment of a court of competent jurisdiction. *Semble.*

Where the directors of an insolvent bank, with the assent of a majority, though without the knowledge of some of its stockholders, assigned all the corporate property to trustees for the payment of the debts of the bank, preferring particular creditors, *it was held,* that the assignment was valid at common law, and was not in contravention of the policy of the statutes of this state.

*It seems* that such an assignment does not, *per se,* operate as a dissolution of the corporation, or surrender of its franchises.

And that the power to make such an assignment, though not conferred by charter, is incident to the general powers conferred upon banking corporations.

The acts providing for proceedings in chancery against corporations, (S. L. 1837, p. 306,) and for the voluntary dissolution of corporations, (S. L. 1839, p. 94,) are not in the nature of statutes of bankruptcy applicable to corporations.

APPEAL from Chancery.

The act of the legislative council of the late territory of Michigan, to incorporate " The President, Directors and Company of the Bank of River Raisin," took effect on the 29th of June, 1832, and conferred upon the persons who should become stockholders of the bank, corporate capacity, with the usual powers incident to banking incorporations.

Soon afterwards, the bank was organized under the provisions of this charter, and commenced doing ordinary banking business, which it continued to do, with the exception of suspensions and and interruptions which occurred between 1838 and 1842, until about the 15th of

May, 1846, when it became wholly unable to meet its engagements, and was compelled to suspend specie payments, and to cease from doing business as a bank, and remained in that condition until the time of the filing of the bill in this case.

On the said 15th of May, the President and Directors of the Bank, without the knowledge or assent of some of its stockholders, but with the approbation of a majority in interest of them, executed, in the name of the corporation, a deed of assignment, by which all the corporate property and effects were conveyed to Charles Noble, Lewis Hall, and Harry V. Man, *in trust*, for the purposes following, to wit: to be collected and sold, as the case and the interest of the creditors of the bank might require, and converted into money, as speedily as might be, for the payment and satisfaction, first, of the debts due from the bank to sundry preferred creditors, in the order of their classification in the assignment; and then for the payment, rateably, of all the other debts and liabilities of the bank. And, finally, the assignment provided that if any surplus should remain in the hands of the assignees, after paying all the debts and liabilities of the bank, and the expenses of the trust, the same should be distributed among the stockholders of the bank according to their respective amounts of stock. The assignees accepted, and proceeded to execute the trust.

In October, 1846, Reuben Town, a creditor of the bank, holding its bills to the amount of $235, which had been presented to the bank for payment and payment refused, filed the bill in this case, against the bank, and the said Noble, Hall, and Man, its assignees, and also against the Attorney General, alleging the above facts, among others, and praying for an injunction restraining the bank from further exercising corporate rights, privileges, or franchises, &c., and said assignees from all further proceedings

under said assignment; and also praying that the assignment might be declared illegal and void, and the said assignees made to account for their doings in the premises; and that the bank might be dissolved, and a receiver appointed to take charge of its effects, &c.

The defendants answered, admitting the facts above stated, but denying the other allegations in the bill.

Subsequently, on hearing before the Chancellor, upon bill and answer, of a motion by the complainant for an injunction, and for the appointment of a receiver, it having been intimated by counsel for the respective parties that the cause would be taken by appeal to this court, the Chancellor, without deliberation, and with the view of expediting the appeal, granted an order for an injunction according to the prayer of the bill, and referring it to a master to appoint a receiver to take charge of the property and effects of the bank, with the rights, powers and duties of receivers under the statute in such case made and provided.

From this order the defendants appealed to this court.

The proceedings in this case were had under the acts providing for proceedings in chancery against corporations, (S. L. 1837, p. 306,) and for the voluntary dissolution of corporations.   (S. L. 1839, pp. 94, 101, §§ 38, 39.)

*R. Manning* and *T. Romeyn*, for complainant.

I.   The validity of the assignment by the bank, is involved in this case.

II.   The assignment is illegal, and should be declared void *at common law.*

1. It contemplates a dissolution of the corporation, and, if sustained, will be, in legal effect, a surrender of its franchises.   *Bank Commissioners* v. *Bank of Brest,* 1 Harr. Ch. R. 111; *Slee* v. *Bloom,* 19 John. R. 456; *People* v. *Bank of Hudson,* 6 Cow. 299; *Boston Glass Manufactory* v.

*Langdon*, 2 Pick. R. 53; *Beaston* v. *Farmers Bank of Delaware*, 12 Peters, 138, per *Story*, J. *dissentiente.*

2. A corporation, even if its stockholders desire it, has no right to surrender its franchises and terminate its existence, without the assent of the power that created it. 1 Bl. Com. 485; Ang. &. Ames on Corp. 656, § 4; Will. on Corp. 230, 332, § 681, and cases there cited; *Enfield Toll Bridge Co.* v. *Connecticut River Co.*, 7 Conn. R. 45; 2 Kent's Com. 311, 260; *Revere* v. *Boston Copper Co.*, 15 Pick. R. 359, 360; *Boston Glass Manufactory* v. *Langdon*, 24 Id. 53; *Crease* v. *Babcock*, 23 Id. 342, '3; *Ward* v. *Sea Ins. Co.*, 7 Paige, 297.

3. Even if the body of the corporation may so dissolve it, the directors have not the right so to do. *Niagara Ins. Co.*, 1 Paige, 260; Will. on Corp. 332; 12 Peters, 138; *Smith* v. *Smith*, 3 S. Car. Eq. R. 574—'6; 2 Kent's Com. 312, '13; 7 Paige, 297, '8; *Bank Commissioners* v. *Bank of Brest*, Harr. Ch. R. 111.

Under this we contend—*First:* That this illegality is not cured by the want of dissent, or even by the subsequent assent of the stockholders;—and, *Secondly:* That the complainant, as a creditor, may insist on the illegality.

4. If the assignment be not viewed as a surrender of all corporate rights, still it was unauthorized by the charter or other law, and is therefore void. No power to make it is expressly given, and none can be implied, 2 Kent's Com. 298, '9; *Dartmouth College* v. *Woodward*, 4 Wheat. 636; *Charles River Bridge* v. *Warren Bridge*, 11 Peters, 544; *State* v. *Granville Alexandrian Society*, 11 Ohio R. 12; *Kemper's Lessee* v. *Cincinnatti, &c. Turnpike Co.*, Ibid. 392; 2 Barn. & Adol. 792; *Knowles' Lessee* v. *Beatty*, 4 Peters, 152. The exercise of such a power is a violation of the contract with the state contained in the charter. *Ward* v. *Sea Insurance Co.*, 7 Paige, 297; Ang. & Ames

on Corp. 510, Old Ed.; *People* v. *Bank of Hudson*, 6 Cowen, 217.

The power of a corporation to make an assignment of all its effects cannot be considered as established by adjudication.    The power to make such an assignment was not involved in *State of Maryland* v. *Bank of Maryland*, 6 Gill. & John. 205, nor in *Union Bank of Tennessee* v. *Ellicott*, Ibid. 363, and what was said on the subject was *dictum*.    *Catlin* v. *The Eagle Bank of New Haven*, 6 Conn. R. 233, *Savings Bank of New Haven* v. *Bates*, 8 Id. 512, and *Dana* v. *Bank of the United States*, 5 Watts & Sarg. 233, were cases of particular, and not of general assignments.    *Ex parte Conway*, 4 Ark. R. 302, was decided on the authority of the Maryland and Connecticut cases.    The reasoning of the court is evidently fallacious; and the objection taken by us, that such an assignment is void because it is a violation of the charter of the corporation, was not taken by counsel, or passed on by the court.    The point decided in *Bruce* v. *Bishop*, 3 Wend. 13, was, that the title of the plaintiffs to the note in suit was good by virtue of an appointment by the court of chancery as receivers, &c.    What the court said on p. 17, as to the validity of the assignment, is *dictum;* is but an opinion that it was not within the policy of the New York act, and did not refer to the general doctrine of the common law; is opposed to the ruling of the circuit judge and of the court of chancery; is not law on its face, being opposed to the New York statute; and refers to an assignment different from the one in question here, as it contemplated a continuance of the bank, and created no preferences.

III.    The assignment is illegal, and should be declared void *under the statutes of this state.*

1. It is void as opposed to the provisions of the act of 1839, (S. L. 1839, p. 94,) entitled " an act to provide for the voluntary dissolution of corporations, and to prescribe

the duties of receivers in chancery in certain cases, and for other purposes." Under this act no corporation can close its affairs, or surrender its charter, without the assent of the state in legal form.

2. It should be declared void, because, having been made in contemplation of insolvency and of a dissolution of the corporation, *to trustees of the directors' selection*, and *preferring some creditors to others*, it is a fraud upon creditors, and contrary to the policy of the statutes of 1836, (S. L. 1836, p. 157,) of 1837, (S. L. 1837, p. 307,) to R. S. 1838, p. 229, and to the statute of 1839, (S. L. 1839, p. 94.) *First:* These contemplate an equal distribution among creditors, of the assets of an insolvent corporation, and under the supervision and control of chancery, through the agency of its own officers. *Second:* They are *bankrupt* laws, and are to be construed together as one system, and favorably for creditors. 2 Kent's Com. 315; 2 Hoven. on Frauds, 331; 1 Burr. 474. *Third:* Transactions contravening the *policy* of these acts are void, even if they are not within the letter. 2 Hov. on Frauds, 368, '9, 360, '1; Cowp. R. 123—5, 632, '3; 3 Ves. 85; 6 T. R. 84; 1 Burr. 476, 482; 14 Ves. 188, note, new ed.; 4 Burr. 2239, '40; 16 Eng. C. L. R. 88; 1 John R. 373, '4; 5 Id. 424; 1 Stark. R. 70, (or 89.)

IV.  Chancery has jurisdiction to set aside an unlawful assignment, not only on general principles, but under the statute 1839. S. L. 1839, p. 103, § 47.

*A. D. Fraser,* (with whom was *J. F. Joy,*) for the defendants.

1. The assignment is valid: it is not in violation of law; nor is it impeached on the ground of fraud.

All corporations have the absolute *jus disponendi* of their property, neither limited as to objects, nor circumscribed as to quantity, unless restrained by charter, or by some

unequivocal provisions of law;—having the same power in this respect as an individal. 1 Kyd. on Corp. 108; 1 Siderfin, 161, notes; 4 Com. Dig. Tit. Franchise (F.) 11, 12; 10 Co. 306; 10 Rep. 1. A corporation may, although insolvent, assign its property in trust for the payment of its debts,—defeating, by preferences, when the law does not inhibit it, the priority of the state. Ang. & Ames on Corp. 126; Kent's Com. 315, note; *State* v. *Bank of Maryland*, 6 Gill. & John. 205; *Union Bank of Tennessee* v. *Ellicott*, Ibid. 363, '71; *Warner* v. *Mower*, 11 Verm. R. 385; *Pope* v. *Stewart*, 2 Stew. R. 401; 2 Bland's Ch. R. 142; *Ex parte Conway*, 4 Ark. R. 302, '46; *Catlin* v. *Eagle Bank of New Haven*, 6 Conn. R. 233; *Savings Bank of New Haven* v. *Bates*, 8 Id. 512; *Dana* v. *Bank of United States*, 5 Watts & Sarg. 240; 3 Id. 205; *Revere* v. *Boston Copper Co.*, 15 Pick. 351; *Lenox* v. *Roberts*, 2 Wheat. 373; 7 Gill. & John. 459, 465; *Brace* v. *Bishop*, 3 Wend. 13; 5 Id. 570; 1 Brock. C. C. R. 461.

2. It may be said that this construction would place too large authority in the hands of the corporate officers, who might place the property beyond the reach of the members; but this court can aid in the case of fraud, and the security against improvidence and bad management must be looked for in the interests, wisdom, and justice of the official agents. 4 & 5 Ohio R. 205; 1 Ves. & Bea. 226.

3. Now there is no fraud here alleged or proved. On the contrary, the object—the payment of the debts of the bank—is a most laudable one. On general principles, therefore, this assignment is perfectly valid, and notwithstanding the bankrupt and insolvent laws. *Pickstoek* v. *Lyster*, 3 Maule & Selw. 371; *Mease* v. *Howel*, 4 East. 1; 5 T. R. 420; *Inglis* v. *Grant*, Ibid. 526; *Nunn* v. *Wilsmore*, 8 Id. 520; *Rex* v. *Watson*, 3 Price Ex. R. 6; *Bailey* v. *Burton*, 8 Wend. 348; *Hunter* v. *U. S.*, 5 Peters, 173; 3 Com. Dig. 285, Title *Covin*, B. 2; *Fidgedon* v. *Beecher*, 2

Rose R. 153 ; *Goss* v. *Neale*, 16 Eng. C. L. R. 387 ; *Phenix* v. *Ingraham's Assignee*, 5 John. R. 425 ; *Brooke* v. *Marbury*, 6 Pet. Cond. R. 233 ; *U. S.* v. *King*, Wallace C. C. R. 21 ; *Wheelwright* v. *Jackson*, 1 Eng. C. L. R. 30 ; S. C. Ibid. 217 ; 3 Taunt. 241 ; *Small* v. *Ondley*, 2 P. Wms. 427.

4. The objection that it was incompetent for the directors to execute the assignment without the concurrence of the stockholders, is untenable, as coming from the present complainant.   If their consent was necessary, their acquiescence is sufficient, for *they* do not complain ; and it was done with the assent of a large majority of the stockholders.   No person can make complaint on this head but the stockholders.   2 Kyd on Corp. 466 ; 1 Id. 308 ; *State* v. *Bank of Vincennes*, 1 Blackf. R. 277 ; Ang. & Ames on Corp. 167, 213, 214, 155—160 ; *Robins* v. *Embree*, 1 Smedes & Marsh. Ch. R. 207, 269 ; *Spear* v. *Ladd*, 11 Mass. R. 94 ; 2 Metc. R. 167.

5. Assuming that the assignment operated as a surrender of the charter it would not therefore be void.   It is surely competent for the bank to close its affairs at any time, and in its own way, even if a surrender followed : this is an incident which belongs to every corporation.   But the assignment has no such effect : the corporation is not even dissolved by the judgment of seizure, but exists until the franchises are seized by execution on the judgment. *Hackstone* v. *Bishop*, 1 Wend. 1 ; 2 Kyd on Corp. 446, 466 ; *State* v. *Bank of Vincennes*, 1 Blackf. R. 271, 282.

6. The assignment is not in violation of the acts of 1837 and 1839, (S. L. 1837, p. 306—'8, S. L. 1839, p. 94—105,) whether the bank was solvent or not.   These statutes no where prohibit such an assignment.   They are not in their nature bankrupt laws, (2 Bl. Com. 209, 307 ;) but were designed merely to prevent the *fraudulent disposition of their property*, by banking corporations.

WHIPPLE, J. delivered the opinion of the Court.

On the part of the complainant, it is contended, that the assignment is void, on general principles, and irrespective of the statutes of this state.

The first reason offered in support of this proposition is, that the assignment is in effect a surrender of the franchises of the corporation, without the concurrence of the state. No rule is better settled than that a corporation may be dissolved, by the surrender of its franchise of being a corporation into the hands of the government: if accepted by the government, the dissolution becomes effectual. The modes in which a surrender is to be made, and as to what facts constitute a surrender, have been a fruitful subject of discussion in the courts of this country. In England, the surrender is by deed to the King, by whom corporations are usually created by charter. In this country, corporations are created by an act of the legislature, and it would seem to follow, in the absence of any statute prescribing the mode in which a surrender is to be made, that to become available, it must be accepted by the authority which created the corporation. I have no doubt that a surrender made by the great body of the society, and accepted by the legislature, would operate as a dissolution of the corporation; but such a surrender and acceptance would not, perhaps, in this country, absolve the corporation from any of its liabilities,—contracts being protected by the constitution of the United States.

Regarding an act of incorporation, when accepted, as a contract between the state and the corporation, it would, then, appear necessary, in order to dissolve a corporation, that the consent of both parties should be obtained. If, therefore, the members of a corporation are desirous of bringing its business to a close, a resolution to surrender by the great body of the corporators, being presented to the legislature, and assented to by that body in the form of a

legislative act, would be effectual to dissolve the corporation. So an act of the legislature repealing the charter, if assented to by the corporation, would operate as a dissolution. That a corporation, by its own act, can dissolve itself, is no where asserted, nor can it be sustained: this must be done by the concurrence of the parties to the compact, or by the solemn judgment of a court of competent jurisdiction. See Ang. & Ames on Corp. 656, '7, '8, and authorities cited in note ; 15 Pick. 351, (*Revere* v. *Boston Copper Co.* ;) 24 Pick. 49, (*Boston Glass Manufactory* v. *Langdon,*) and cases there cited ; 2 Kent's Com. 310.

Applying these rules and principles to the case before us, it would be difficult to maintain, that the assignment either operated as a surrender of the charter, or a dissolution of the corporation. The deed of assignment does not indicate, on the part of the corporation, any design to surrender its franchises, or contemplate a dissolution. On the contrary, it appears from the deed that the assignment was executed on account of the inability of the the bank to pay, at that time, its debts, on demand, owing to the difficulty of converting the property and assets of the bank into cash ; and the answer, though it admits that the bank had suspended the payment of its debts in specie, and failed to meet its engagements, and had ceased to do banking business, does not admit that the bank will prove insolvent, or be unable ultimately to pay its creditors.

Admitting for a moment the legal competency of the corporation to make an effectual surrender of its franchises without the consent of the state, it is apprehended that the facts disclosed in the deed of assignment and answer would not amount to such surrender. It is not essential to the existence of a corporation that it should possess property ; its legal existence, therefore, is not ne-

cessarily determined by even actual insolvency.  24 Pick. R. 53.  The *franchise* remained, although the bank may have assigned all its property to pay its debts.  By thus dispossessing itself of its property, the bank might be under the necessity of discontinuing, temporarily, and perhaps permanently, its proper and legitimate business. The capital stock of the bank was $100,000, with the power to increase it to $500,000.  Suppose on the day following the assignment, the bank had, by resolution, increased its capital stock $100,000, and that this amount had been actually paid in, and the usual business of the bank resumed ; could it be contended that the assignment of all the property that it possessed the day before, would have so far operated as a dissolution as to render all the subsequent acts nugatory ?  I think not.  The existence of the franchise would have continued unless the state had interposed ; had arrested the proceedings by some legal measure, founded on a violation by the bank of some law by which it was bound.  But suppose that the bank had ceased to perform its functions for a year, for the want of the necessary means of action ; would this circumstance operate *per se* as a dissolution of the franchise ? It is believed that it would not.  The body may have lain dormant during that year, but, if in a condition to be revived, and if in point of fact it is revived, I know of no reason why it may not continue its business.  By thus failing to fulfil the purposes of its creation, its franchises may be liable to forfeiture ; but this forfeiture can only take effect after a judgment by a competent judicial tribunal, upon a direct proceeding instituted for that purpose, by the state, or under its authority and sanction. The corporate existence would, in the case supposed, as in every other case of neglect of duty, or abuse of power, continue until that existence is determined by a judicial decree.  If the state does not choose to institute the

necessary proceedings, with a view to a dissolution, the acts of the bank, within the range of the powers conferred upon it, would be valid and binding; and the question as to whether it had forfeited its charter could not be inquired into in a collateral action.

To sustain the position that the assignment made by the bank was tantamount to a surrender of its charter, we have been cited to numerous cases, which I now propose to examine very briefly. In the case of *The Bank Commissioners* v. *Bank of Brest*, Harr. Ch. R. 106, Chancellor *Farnsworth* uses this language: " If this assignment is valid, it is no doubt a surrender of its charter; for if a corporation suffers acts to be done which destroy the end and object for which it was instituted, it is equivalent to a surrender of its rights." To support this doctrine the Chancellor refers to the following cases, which have also been cited by counsel, viz: *Slee* v. *Bloom*, 19 John. R. 456, and *The People* v. *Bank of Hudson*, 6 Cow. 219. In the first case, Chief Justice *Spencer*, in delivering the opinion of the court, says: " The ground on which I place my opinion that the corporation is dissolved, is, that they have done and suffered to be done acts *equivalent* to a surrender." Of the correctness of this opinion, there can be no doubt, if it be confined to the facts of the case then before the court; but if it was intended as the statement of a general principle, applicable to all corporations, and to a different state of facts, then it is apprehended, that it is not sustained by elementary writers or adjudged cases.

To ascertain how far the case of *Slee* v. *Bloom* supports the doctrine contended for, and the ruling of the Chancellor in the case of *The Bank Commissioners* v. *Bank of Brest*, it will be necessary to understand the facts upon which the decision of the court was based. In 1814, the respondents associated together and became a corporation

according to the provisions of the *statute of New York* relative to corporations for manufacturing purposes.    In 1816, it was resolved that it was inexpedient to continue the factory in operation.    After 1817, there was no meeting of the trustees, nor any business or act done by the corporation.    In 1818, all the property of the corporation, real and personal, was sold under an execution.    In 1819, Slee, who was a creditor of the corporation, filed his bill to charge the defendants, under the provisions of the seventh section of the act which made the corporators liable individually for the debts of the corporation to the extent of their respective shares of the stock, *after the dissolution of the corporation.*    The question before the court was, whether the corporation, according to the true intent and meaning of the seventh section of the act, was *dissolved,* so as to render the respondents individually liable, although no judicial decree of dissolving the corporation had been pronounced.    It is easy to perceive how the act above stated, would justify the opinion of the court of errors, that, according to the true intent and meaning of the act, there was such a *dissolution* of the corporation as would render the corporators liable in their individual capacity.    The whole business of the corporation was, by a solemn resolution, discontinued, and all its effects sold under an execution.    It certainly never was contemplated by the legislature that a creditor was bound to wait until the expiration of the time limited for the continuance of the corporation, (twenty years,) or until it was legally dissolved by a proceeding to be instituted by the state to annul the charter, before he could avail himself of the remedy provided by the act under which the corporation was organized.    For the purpose of affording a remedy to creditors, the corporation was virtually *dissolved* in 1818, by unequivocal acts indicating an abandonment of their franchises.

The facts, then, justified the principle laid down by Chief Justice *Spencer ;* and it would be fair to infer that it was only to be applied to cases where debts due by a corporation, at the time of its dissolution, *were chargeable to the individual members,* or other special cases; although a reference, in the opinion of the Chief Justice, to 2 Kyd on Corporations, might induce the belief that the principle stated by him was intended to have a more extended application. The quotation from Kyd is as follows : " The rule adopted in all the cases which have occurred on this question, seems to have been this, that where the effect of the surrender is to destroy the end for which the corporation or corporate capacity was instituted, the corporation or corporate capacity is itself destroyed." Immediately preceding this passage, and in connection with it, Kyd uses this language : " That a corporation may, in point of fact, destroy itself, by its own act, seems as easy to be comprehended, as that a natural person may put an end to his life by his own hands. The acting part of the corporation put the common seal to a deed of surrender ; carry up all their charters to St. James', and lay them at the King's feet ; procure the surrender to be enrolled, and desert all the corporate functions ; must not the consequence be that in a little time the corporate existence must be at an end ?" And, in a passage immediately following the text above quoted, we find illustrations of it, which tend to show the application and extent of the principle it embodies. " Thus," says Lord *Coke,* on the authority of the book of assize, " if there be a Warden of a Chapel, and the Chapel and possessions be aliened, he ceases to be a corporation, because he cannot be Warden of nothing. But if the body of a prebend be a manor and no more, and the manor be recovered from the prebendary by title paramount, yet his corporate capacity remains, because he has *stallum in choro et vocem in capitulo,* and

he is prebendary, although he have no possessions." The mode of dissolving a corporation in England *by a surrender of its franchises*, is clearly pointed out ; and it would seem to follow that unless the effect of the surrender is to destroy the end for which the corporation was instituted, the corporation is not destroyed ; or in other words, *there may be a surrender*, without a dissolution of the corporate capacity.

If the rule as laid down by Kyd be correct, I think the learned Chief Justice could hardly have intended to convey the idea that the acts done and suffered by the corporation referred to in the case of *Slee* v. *Bloom*, operated to all intents and purposes as an actual surrender, or that the corporate existence was at an end. That it continued, so as to enable the corporation to sue by its corporate name, and to receive payment of debts, there can be no doubt. It is equally clear, that a suit might have been maintained against the corporation by a creditor seeking to charge it with a debt. This is the view of that decision taken by Chancellor *Kent*, (2 Com. 312.) He says : " It was held in the court of errors of New York, in *Slee* v. *Bloom*, that the trustees of a private corporation may do what would be equivalent to a surrender of their trust, by an intentional abandonment of their franchises, so as to warrant a court of justice to consider the corporation as in fact dissolved. But that case is not to be carried beyond the precise facts on which it rested. It ought only to be applied to a case where the debts due at the time of the dissolution are chargeable on the individual members, and then it becomes a safe precedent. It amounts only to this, that if a private corporation suffer all their property to be sacrificed, and the trustees actually relinquish their trust, and omit the annual election, and do no act manifesting an intention to resume their corporate functions, the courts of justice may, *for the sake of the remedy,*

*and in favor of creditors* who, in such case, have the remedy against the individual members, presume a virtual surrender of the corporate rights, and a dissolution of the corporation.    This is the utmost extent to which the doctrine was carried, and, in such a case, it is a safe and reasonable doctrine."    The same view of the case of *Slee* v. *Bloom,* is taken in Angel & Ames on Corporations, 659. It is there said, that " if a corporation, being indebted, suffer all its property to be sacrificed, and the trustees actually relinquish their trust and omit the annual election, and do no one act manifesting an intention to resume their corporate functions, the courts may, *for the sake of the remedy against the individual members, and in favor of creditors,* presume a *virtual* surrender," &c.    And again : " The courts of New York did not decide that the corporations had lost all their rights, but that even if they had a right to reorganize themselves, the case had happened in which, with regard to their creditors, they were dissolved."

In the case of *Revere* v. *The Boston Copper Co.*, 15 Pick. 351, the facts were that a majority of the stockholders voted to dissolve the corporation, and wind up its affairs. To carry out this resolution, all the property was transferred to trustees, with authority to pay the debts and distribute the surplus among the stockholders ; and they gave notice to the executive department of the government, that they claimed no further interest in their act of incorporation.    The supreme court held, " that, by the acts disclosed, the corporation was not dissolved."    In the case of *The Boston Glass Manufactory* v. *Langdon*, 24 Pick. 49, it was decided that a corporation could not surrender its charter without some solemn act of the corporation for that purpose ; and that a surrender would not be of any avail until accepted by the government.    In that case the corporation became actually insolvent ; assigned all its

property for the payment of its debts; and omitted, for several years, to choose officers, or to hold meetings. In both of the cases last cited, the case of *Slee* v. *Bloom* was referred to by counsel, who insisted that the insolvency of a corporation, alienation of all its property, and cessation to do business, amounted to a dissolution. The supreme court of Massachusetts, however, rejected this doctrine, and held that such acts did not extinguish the legal existence of a corporation.

These authorities, if sound, are conclusive upon the first proposition made by the counsel for the complainant. They establish beyond controversy, that the acts done and suffered by the Bank of River Raisin were, in no legal sense, a surrender of their chartered rights, nor did they work a dissolution of the corporation.* The cases of *The Bank Commissioners* v. *Bank of Brest*, and *The People* v. *Bank of Hudson*, purport to be based upon that of *Slee* v. *Bloom*. The Chancellor of this state, in the first case, and the supreme court of New York in the second, seem to have given to the opinion of Chief Justice *Spencer* in *Slee* v. *Bloom*, a scope and meaning not warranted by the facts of the case. The broad language used in the opinion of Chief Justice *Spencer*, would, if construed literally, embrace the case before us; but I trust it has been shown that the doctrine therein advanced is unsound in principle, and unsupported by authority, when applied to the facts of the case before us.

The reasoning which has been employed in support of our views upon the first proposition argued by counsel, involved the discussion of the second proposition, viz: that a corporation has no right to surrender its franchises and terminate its existence, without the assent of the pow-

* In *The State* v. *The Real Estate Bank*, 5 Pike R. 596, 607, a general assignment by a bank though admitted to be valid, was held a good *cause* of forfeiture of its charter.

er that created it.   We affirmed the correctness of the
proposition that, in general, private corporations aggre-
gate, such as are usual in this country, cannot surrender
their franchises without the assent of the state.   It be-
comes only necessary to repeat what has been already
stated, that the facts do not make out a case to which the
rule can be applied.   The views we have already ex-
pressed, also determine the third proposition, which as-
serts that even if the body of the corporation have, at
common law, a right to dissolve the corporation, the di-
rectors may not do it. .

I shall now proceed to consider the fourth ground urged
against the validity of the assignment.   It was contended
that if the assignment be not viewed as a surrender of all
corporate rights, still, it was unauthorized by the charter,
and is therefore void.   I have given to this proposition,
and to the very able arguments by which it was attempt-
ed to be sustained, the most careful consideration; and,
in doing so, have felt strongly inclined to declare all such
assignments void, unless upon clear legal principles, and
strong authority, I should be driven to the necessity of af-
firming their validity.   That the power exercised by di-
rectors in making such assignments, has been productive,
in many instances, of great wrong and injustice, cannot
be doubted.   Preferences have been made, by which
those who have knowingly contributed to bring upon the
community the mischiefs which always follow in the train
of bank explosions, have been secured against loss, while
the innocent and unsuspecting creditor and bill holder
have been the victims of the foulest frauds, and reaped
the bitter fruits of misapplied confidence;—a confidence
oftentimes induced by the conduct of those *preferred*, or,
as they are sometimes called, *confidential* creditors.   To
provide a remedy which shall effectually cure the evil, is

the business of the legislature, and not of courts. *We* must expound the law as we find it.

It was contended that the power to execute this assignment was not *expressly* given by the act of incorporation, and that it could not be *implied.* We subscribe fully to the modern doctrine, so universally recognized, that corporations possess such powers only as are *specifically* granted, or as are necessary to carry into effect the *powers expressly granted.* At the common law, corporations possessed, as an incident, the capacity to purchase and alien lands and chattels; and this capacity was unlimited, except in so far as specific restraints were imposed by their charters, or by some statute by which they were bound. Chancellor *Kent,* (2 Kent's Com. 281,) says: "Independent of positive law, all corporations possess the absolute *jus disponendi,* neither limited as to objects, nor circumscribed as to quantity." Their capacities in this respect, are as full and ample over the property, as are those of a natural person, unless restricted by the charters by which they are created. In determining whether a corporation has assumed powers in derogation of its charter, we must carefully distinguish between such as are substantive, and expressly granted, and such as are merely incidental, and often necessary to its existence. The distinction between these two classes of powers is sufficiently obvious. The first class embraces the general object and purpose of its creation; and, if powers are assumed foreign to such object and purpose, its charter is liable to forfeiture at the instance of the authority by whom they were granted. The second class includes such powers as are sometimes vital to its existence, and furnish the means by which the powers expressly delegated are carried out. The case before us furnishes an apt illustration of the line of distinction I am endeavoring to draw between those powers which the charter of its cre-

ation confers upon a corporation, and such as are mere-
ly incidental.   The act incorporating the River Raisin
Bank, confers upon the corporation banking powers.   To
transact banking business, then, was the object for which
it was created.   If, in addition to these powers, the cor-
poration had assumed the rights usually granted to insu-
rance companies, or engaged in other business foreign to
banking, its charter might be forfeited for an abuse of its
powers.   But, to accomplish the end for which it was
created, it possesses, besides the powers incident to every
corporation, that of employing agents and servants to
transact its business ; of collecting its debts ; of discharg-
ing its liabilities ; of converting the property and assets
of the corporation into money, to fulfil its obligations to
the public ; and a variety of other powers peculiar to such
corporations.   If I have succeeded in making myself un-
derstood, it is very clear, that the authority of the bank
to pay its debts is incidental, and, as the act of incorpo-
ration will show, necessary to its very existence ; for a
failure in this respect, would subject the franchises of the
corporation to forfeiture.   But while it is admitted that
the bank was authorized and required, on pain of forfeit-
ure, to employ all its assets, real and personal, to pay its
debts, it is objected that the means adopted were not war-
ranted by its charter.   Because, first, corporate rights
may be forfeited for non user ; as, where a bank assigns
so much of its property to trustees for the payment of
its debts as to render it incapable of continuing its bank-
ing operations.   It is admitted that a corporation may
forfeit its charter as well for a *neglect*, as for an *abuse* of its
franchises.   But it does not necessarily follow, that a
bank discontinues the exercise of all its corporate func-
tions, by the assignment of its assets for the payment of
its debts.   If there exists a legal capacity to resume its
business, by an increase of its capital, or otherwise, a

corporation is not dissolved, although it may not only have parted with all its property, but temporarily suspended business.    Angel & Ames on Corp. 658; *Brinkerhoof v. Brown*, 7 John. Ch. R. 217; *State* v. *Bank of Maryland*, 6 Gill & John. 205.    But if a temporary suspension of any of its powers would authorize the institution of proceedings with a view to a dissolution, it is for the state, through its judiciary, to say whether, under the circumstances, a dissolution should be decreed.    A suspension of corporate functions may be waived by the power which created the corporation ; but if not waived, and proceedings are instituted by the state, or under its authority, to dissolve the corporation, the court before whom the proceedings are had, would not, in the exercise of the large discretionary powers with which it is in such cases invested, decree a forfeiture, where there is a reasonable hope that it may resume its corporate duties.    In other words, *non user* of its franchises, by a corporation, is not *necessarily* followed by a forfeiture of those franchises.

But it is said, secondly, that as the bank, by assigning so much of its property as to be incapable of continuing its business, may forfeit its charter, it follows that such assignment must be void.    The reasoning of the counsel upon this point is, that if the right to make the assignment is unquestionable, it would be no ground of forfeiture ; but as it is a ground of forfeiture, it follows that such an act is invalid.    This reasoning, *it appears to me, is more* ingenious than sound.    A forfeiture of a charter in such circumstances, does not result from the fact that the bank has appropriated its property in discharge of its liabilities, but because the bank, in performing a duty imposed by its charter, may find itself unable to act up to the end for which it was created.

The fallacy of the argument of counsel will appear, if we consider the consequences to which it would lead.    It

cannot be denied that a bank is bound by high moral considerations, to dedicate the whole of its property to the payment of its debts. The duty of a corporation in this respect differs not from that of an individual. If, then, the bank, in the performance of this duty, devotes all its property for the object stated, it would incur a forfeiture of its charter, if the reasoning of counsel be sound ; and yet it would be an anomalous proceeding for a court to pronounce a judgment of forfeiture against a bank, for doing an act which, if left undone, would subject it to the high penalties which follow a violation of its charter.

It is further insisted, thirdly, that the court will not imply the existence of a power which may be used to the detriment of creditors. The same argument may be used in regard to most of the implied powers which the bank possessed. Individuals are not bound to contract business relations with banks : if they do, they must incur all the hazard incident to such relation. If a person accept bills of a bank in payment of a debt, he accepts them with a full knowledge of all the powers with which the bank is invested. He knows that these powers may be abused. If, therefore, he substitutes the credit of a bank for that of an individual, he must bear all the consequences which flow from his own voluntary act.

While general assignments, made by a bank, of all its property for the benefit of creditors, are considered by counsel as invalid, especially where preferences are created in favor of particular creditors, the legality of special assignments is admitted. The reason given for the distinction is, that a special assignment is made to pay or secure a debt due by the corporation; while a general assignment divests the corporation of the power to exercise its corporate functions, and devolves on third persons the management of the corporate effects, and the duty of paying corporate debts. I have already endeavored to

prove that the assignment in the case before us, did not, in and of itself, operate as a dissolution of the corporation. If the reason last urged be a sound one, it applies as well to special as to general assignments; in both instances, the management of corporate effects, and the payment of corporate debts, is confided to third persons; for, in a legal point of view, I am unable to perceive the difference between an assignment to secure a debt, made directly to a creditor of a bank, and an assignment made to a third person, to effect the same object. If a bank may make *one* special assignment for the purpose of securing one of its creditors, why may it not make as many as may be necessary to secure each and every of its creditors, until all its property is exhausted ? *The last* assignment which embraces the remaining assets held by the bank, is just as valid as the first. If so, I am at a loss to discover why, upon principle, the same object may not be attained by an assignment of all the assets for the benefit of creditors generally. The only difference consistsin this : that, in the one case, the whole property of the bank is assigned in several instruments, for the legitimate purpose of paying the corporate debts; while, in the other, but one instrument is made to effect the very same purpose. It is not difficult to see, also, that where a bank is driven by pressing necessity to multiply special assignments to secure the payment of its debts, and preserve its credit, preferences are in fact made. Those provided for by the first assignment are usually amply secured, while others are but partially secured. The assignment is not invalidated by being made by the bank to third persons. The mode and manner in which its liabilities are to be met, must, of necessity, be left to the discretion of those to whom the bank has confided the management of its affairs. Whether a payment is made directly by the bank, or through agents of its own selection;

can make no difference. By the instrument of assignment, the bank prescribes the powers and duties of the assignee, and does not commit the management of its assets to the unlimited control of third persons. The assignee is bound to execute the will of the bank as it is manifested in the instrument.

The last reason assigned under the first general head, why the assignment in question should be declared void, is, that, admitting that the stockholders had the right to dissolve the corporation, the directors had no such power. This reason is predicated upon the assumed fact, that the assignment had the effect of dissolving the corporation. We have already said, that the assignment did not work a dissolution of the corporation ; and as the whole management and control of the property and affairs of the bank, is, by the charter, conferred upon the board of directors, the execution of the assignment by them was unobjectionable.

The assignment before us, made by the bank for the benefit of its creditors, may, I think, be sustained upon principle. Such assignments have received the sanction of some of the state courts, where their validity was directly drawn in question. In other cases they have been sustained, where their validity was not assailed. *State* v. *Bank of Maryland,* 6 Gill. & John. 205 ; *Union Bank of Tennessee* v. *Elliott,* Ibid. 363 ; *Warner* v. *Mower,* 11 Verm. R. 385; *Pope* v. *Stewart,* 2 Stewart, 401 ; 2 Bland's Ch. R. 142, *(Binney's case ;)* 4 Ark. R. 302, *(Conway's case ;)* 3 Wend. 13, *(Huxter & Brace* v. *Bishop ;)* 5 Watts & Serg. 223, *(Dana* v. *Bank U. S.;)* Ang. & Ames on Corp. 126.*

The next general objection to the validity of the as-

* See, also, 1 Amer. Leading Cases, 78 and 79, and cases there cited.

signment is, that it is opposed to the policy of the statutes of this state.

The act of 1837, (S. L. 1837, p. 307,) which provides for proceedings in chancery against corporations, and that of 1839, (S. L. 1839, p. 94,) which provides for the voluntary dissolution of corporations, are the only statutes, the policy of which, it is said, would be defeated by sustaining the assignment made by the bank.

The act of 1837 contains some of the provisions embodied in article second of the Revised Statutes of New York, entitled, " Of proceedings against corporations in equity." (Vol. 2, p. 377.) It confers upon the Chancellor the authority *to dissolve any corporation having banking powers, when such corporation shall become insolvent, or violate any provision of its charter.* The third section of the act provides that, whenever any corporation having banking powers, shall become insolvent, or shall refuse to pay its debts, or shall violate any of the provisions of its charter, or act of incorporation, *or any other law binding on the same,* the Chancellor may, by injunction, restrain such corporation and its officers from exercising any, or all its corporate rights, and from receiving any debts or demands due or to become the same, and from paying out, or in any way transferring or delivering to any person any of the money or effects of such corporation, and likewise restrain any person or persons from transferring, in like manner, the whole or any part of his or their property or effects, who may directly or indirectly be liable for the payment of the debts or liabilities of such corporation. The fourth section provides, that such injunction may be issued on the application of the Attorney General, in behalf of the state, or of any creditor or stockholder of such corporation. The fifth section provides, that a receiver may be appointed to take charge of the property and effects, and collect the debts due the corpora-

tion.   The seventh section confers power upon the Chancellor to compel such corporation, its officers, agents and stockholders to discover any property belonging to the corporation, &c.

Such are the general provisions of the act of 1837, and I see nothing in them which renders the assignment by the River Raisin Bank void.   The act certainly does not, in express terms, prohibit such an assignment; nor does such an assignment defeat any object or purpose contemplated by the act.   It simply affords a new remedy against corporations generally, for assuming or exercising any franchise, liberty, or privilege, or transacting any business not allowed by its charter; and to restrain individuals from exercising any corporate rights not granted by any law of this state.   The other sections invest the court of chancery with new powers, and give a new remedy against corporations having banking powers, in case of their insolvency, or when such corporations shall violate any provisions of their charters, or other law binding on them.

The article of the New York statute, from which those provisions are borrowed, contains various others.   It confers the most ample powers upon receivers, by which they are enabled to wind up the affairs of the corporation.   Provision is also made for making all the creditors of the corporation parties to the proceeding.   It gives to the Chancellor the most ample jurisdiction over all the officers of the corporation, and declares, in express terms, that all alienations made by such officers, contrary to the provisions of law, shall be set aside.   Among these provisions of law, is that contained in section 4, title 4, (1 Rev. Stat. N. Y., p. 603,) entitled, "Special provisions relating to certain corporations," which provides, that, "whenever any incorporated company shall have refused payment of any of its notes, or other evidences

of debt, in specie, or lawful money of the United States, it shall not be lawful for such company, or any of its officers, to assign or transfer any of the property or choses in action of such company, to any officer or stockholder of such company, directly or indirectly, for the payment of any debt; *and it shall not be lawful to make any transfer or assignment in contemplation of the insolvency of such company,* to any person or persons whatever.   And every such transfer and assignment to such officer, stockholder, *or other person,* or in trust for them or their benefit, *shall be utterly void."*

This provision, taken in connection with the other provisions contained in the Revised Statutes of New York, make, so far as corporations are concerned, a bankrupt system.   Our act of 1837, contains, within itself, scarcely an element of a bankrupt system.   If intended for one, the legislature have been careful to exclude the idea that such was their intention, by failing to incorporate in the act those parts of the Revised Statutes of New York from which it was borrowed, and which carry, on their face, the evidence that a bankrupt system was contemplated.   Speaking of the act of New York of 1825, in relation to corporations, Chancellor *Kent,* (2 Kent's Com. 315,) says:  "It contained many directions calculated to check abuses in the management of all monied incorporations, and to facilitate the recovery of debts against them.   All transfers by incorporated companies, in contemplation of bankruptcy, were declared void; and if any incorporated bank should become insolvent, or violate its charter, the Chancellor was authorized, by process of injunction, to restrain the exercise of its powers, and to appoint a receiver; and to cause the effects of the company to be distributed among the creditors.   *This was a statute of bankruptcy in relation to incorporated banks."*
If these provisions had been incorporated in the act of

1837, and the means devised, as in the statute of New York, for carrying them into effect, we should have had no hesitation in determining that a bankrupt system was intended.

The act of 1839 has not, so far as I am able to discover, the slightest relation to the question before us. It simply provides a mode by which corporations may make a surrender of their rights and procure a distribution. It declares void all assignments of property, *after* the presentation of the petition, but does not invalidate assignments made before proceedings were commenced under its provisions. The act is not mandatory in its terms; nor was it intended to prevent a corporation from appropriating its property in payment of its debts, provided that, in so doing, it did not violate any law by which it was bound, and that such appropriation was not tainted with fraud. Such, it seems to me, was the object which the legislature had in view in the various acts relating to banking corporations. In the case of the *Bank Commissioners* v. *The Bank of Brest*, the Chancellor decided that the assignment made by the bank was void, because it evaded the provisions of the statute applicable to that class of corporations to which the Bank of Brest belonged; and because the directors, in making the assignment without the assent of their stockholders, exceeded their powers. The facts in that case differed essentially from those which appear in the case before us. The intention of the directors to wind up the affairs of the bank, was expressly admitted; and one of the reasons given for this proceeding, was, that they were *unable to perfect the securities required by law*. Besides, the Bank of Brest was subject to the provisions of the safety fund act; and the argument of the Attorney General against the validity of the assignment was founded upon the fact, that it contravened the policy of that act, and the act of 1838.

No reference whatever was had by him to the act of 1837. It is averred in the bill that the Bank of River Raisin was subject to the provisions of an act entitled " An act suspending, for a limited time, certain provisions of law, and for other purposes," approved June 22, 1837. By the eighth section of this act its provisions were declared inapplicable to any bank not subject to the act of 1836, (commonly called the safety fund act,) unless such bank should signify its assent to that act, so far as regards the visitation of the Bank Commissioner for the purposes specified in said act, and to ascertain the transactions of the bank in the sale of specie and bullion. All other provisions of the safety fund act were, therefore, inapplicable to the Bank of River Raisin; and we are, therefore, not called upon to affirm or deny the correctness of the opinion of the Chancellor in the case referred to. It may be that upon the facts admitted to exist, the assignment was void, as it defeated the policy of those statutes by which the banks organized under the general banking law were bound.

*Decree reversed.*