HEARD APRIL TERM, 1879.

CASE No. 745.

EX PARTE W. G. CHILDS, ASSIGNEE.

EX PARTE W. A. CLARK, ASSIGNEE.

EX PARTE W. A. CLARK, ASSIGNEE.

1. Where the legislature establishes an inferior tribunal, and gives no right of appeal from its decisions, the only office of the writ of *certiorari* is to determine whether the inferior tribunal has acted within the scope of its powers, and not to determine whether in so acting, it has committed errors of law or fact. *Cases reviewed.*

2. The jurisdiction of the Supreme Court as defined in Article IV., Section 4, of the constitution, embraces a writ of *certiorari* only when necessary to a general supervisory control over an inferior court—that is, such a supervision as will enable it to keep the inferior court within the limits of its jurisdiction.

3. The "Court of Claims" established by the legislature by the act approved March 22d, 1878, (16 *Stat.* 555,) is not a *court*, organized under the authority of Article IV., Section 1, of the constitution, but a tribunal in the nature of a board of audit, created under Article XIV., Section 4, to inquire into the amount and character of the unfunded debt of the state.

4. Claims known as "Little Bonanza Warrants" being presented before the commissioner of such "Court of Claims," before the enactment of the amendatory act of December 24th, 1878, it was not error on the part of such commissioner to require the claimants to prove the *bona fides* of the original consideration upon which their claims were founded.

This was an original application to this court for a writ of *certiorari.*

On December 24th, 1875, the general assembly of South Carolina passed two acts providing for the payment of certain claims against the state. The first was entitled "An act to provide for the payment of certain indebtedness of the state," and was nick-named the "Little Bonanza;" the other was entitled "An act to provide for the settlement and payment of certain claims against the state," and was nick-named the "Big Bonanza." By these nick-names they are sometimes designated in subsequent legislation. The little bonanza act specified certain claims by name and amount, for which the comptroller-general should

issue his warrants in sets of three, payable in one, two and three years, with interest from date.

The petitioners in the three cases stated at the head of this decision, were assignees of some of these little bonanza warrants.

On March 22d, 1878, the legislature passed an act entitled, " An act to provide for the settlement of the unfunded debt of the state incurred before the first of November, 1876." The scope of this act is sufficiently set forth in the opinion of the court, the class of claims against the state alluded to, as being provided for in the fifth section, being big bonanza warrants.

The petitioners presented their claims to Hon. James C. Coit, commissioner of this Court of Claims, who required them to prove the *bona fides* of the original consideration against the state, upon which their claims were founded.

On December 24th, 1878, this act was amended, (16 *Stat.* 787), Section 5 of the original act (providing for the payment of the big bonanza warrants) having added to it these words : " And in all other cases, including the warrants known as little bonanzas, the burden of proof shall be upon the claimant to establish the *bona fides* of the original consideration upon which the claim is based."

The petitions in the three cases were all presented to this court in April, 1879, and were heard together during the same term of the court.

*Messrs. Rion, Lyles & Barron,* for petitioners.

This court has jurisdiction to grant the writ prayed for. *Const., Art. IV.,* §§ 1, 4 ; 5 *S. C.* 117. The " Court of Claims " is a judicial tribunal, having a clerk, seal and records. The error alleged is one that will be reviewed by this court upon this writ. 5 *Wait Pr.* 451, 452, 465. The court will go beyond mere jurisdictional questions, the proceedings below being of a summary character, and there being no other remedy. 2 *Wait Act. & Def.* 139, §.5 ; 29 *Wis.* 444 ; 40 *N. Y.* 154 ; 39 *N. Y.* 81 ; 40 *Cal.* 479. In our own state, see 2 *Hill* 367 ; 3 *Rich.* 113 ; 5 *Strob.* 29 ; 9 *Rich.* 292 ; 5 *S. C.* 117. The writ will lie, unless expressly taken away by statute. 2 *Hill* 367 ; 5 *S. C.* 117 ; 1 *Strob.* 198 ; 23 *Wend.* 277 ; 20 *Johns.* 430 ; 40 *Cal.* 479.

*Mr. L. F. Youmans*, attorney-general, for respondent.

The alleged error is not an error of law; if error at all, it is error of fact, not remediable by *certiorari*. 2 *Wait Act. & Def.* 140. Section 5 shows that only those warrants should be received without evidence. The amendatory act amending Section 5, makes it still plainer. Respondent has followed the acts. The petitioners, by their action, have waived all objections to the two acts. The Supreme Court has no jurisdiction of these cases. *Const., Art. IV.,* § 4. This is not a court at all. It is a tribunal created under Article XIV., Section 4; what might have been committed to a committee of the legislature, or other board, or officer. If errors are committed they can be corrected only by the legislature. *Certiorari* is not a writ of right, but grantable only in the sound discretion of the court. 2 *Bac. Ab., tit.* "*Certiorari,*" *A*, 164, 165; 5 *Wait Pr.* 454, 459, 460; 2 *Wait Act. & Def.* 135. The common law *certiorari* (that here prayed for), reaches only patent defects. 2 *Wait Act. & Def.* 135, 139. For the judicial department to attempt a settlement of the unfunded debt of South Carolina, would open Pandora's box of evils, and would be in violation of Article I., Section 26, of the constitution.

June 25th, 1879. The opinion of the court was delivered by

McIVER, A. J. These three cases, involving the same questions, were heard and will be considered together. They were petitions addressed to this court in the exercise of its original jurisdiction, praying that writs of *certiorari* be issued, directed to James C. Coit, Esq., commissioner of the Court of Claims, established by " An act to provide for the settlement of the unfunded debt of the state, incurred before November 1st, 1876," approved March 22d, 1878, (16 *Stat.* 555), as amended by an act approved December 24th, 1878, (16 *Stat.* 787), for the purpose of " ascertaining all legal and just claims which have not been funded in bonds or stock," commanding the said commissioner to certify to this court the records of the several claims of the petitioners, that they may have justice done to them in the premises. Upon the filing of the petitions rules were issued requiring said commissioner to show cause why the writs should not issue

as prayed for in the petition. To these rules the commissioner has made return, as follows: " 1. That the action of respondent, set forth in the petition, is final and not reviewable by any of the courts of the state. 2. That this honorable court has not jurisdiction to issue the writ of *certiorari* prayed for. 3. That the action of respondent, set forth in the petition, is not an error of law."

The error of law alleged in each of the petitions is that the commissioner required the petitioners to make proof of the *bona fides* of the original consideration upon which the claim was based, notwithstanding it had been previously approved by the legislature and ordered to be paid, and a warrant given therefor by a former comptroller-general of the state. It will seen, therefore, that the error which this court is thus asked to review and correct is not one of a jurisdictional character, but only an alleged error of law in applying the rules of evidence as to the burden of proof. There is no allegation that the commissioner has either exceeded his jurisdiction, or has failed or refused to exercise any of the powers conferred upon him by the act establishing his office. The question whether a common law writ of *certiorari* goes only to correct errors of a jurisdictional character or extends to any error of law, and is, in fact, a substitute for a writ of error, where no other remedy has been provided, has given rise to much conflict of opinion, and has been variously decided.

We think, however, that the true rule, which is not without the support of high authority, is this: where the legislature establishes an inferior tribunal, and gives no right of appeal from its decisions, the only office of the writ of *certiorari* is to determine whether the inferior tribunal has acted within the scope of its powers, and not to determine whether in so acting it has committed errors of law or fact. It cannot be used for the purpose of determining whether such inferior tribunal has committed an error of judgment in exercising the powers granted, but only to determine whether it has exceeded or has failed to exercise any of the powers granted. Any other rule would deny to the legislature the power of establishing an inferior tribunal with jurisdiction to hear and *finally* dispose of any matter. If the

legislature, in establishing an inferior tribunal, designed that its decisions should be reviewable by appeal or otherwise, it would be very easy to say so, but if they did not so intend, then, certainly, this court ought not to thwart their intention by the exercise of what is at least a doubtful power. When, however, such inferior tribunal undertakes to go beyond the limits of its jurisdiction, as prescribed in the act creating it, or fails or refuses to exercise any of the powers granted, it then becomes the duty of this court to see that it keeps within the limits prescribed for it, and that it performs the functions for which it was created, thus carrying into effect, instead of thwarting, the intention of the legislature. A reference to some of the cases will show that these views are not without the support of authority.

In *Groenvelt* v. *Burwell*, 1 *Salk.* 144, the question was whether the Court of King's Bench could send a writ of *certiorari* to the censors of the College of Physicians, who, by their charter, were authorized to fine and imprison for malpractice. The writ was allowed, and Holt, C. J., said: " It is a consequence of every inferior jurisdiction of record that their proceedings be removable into this court to inspect the record and see *whether they keep themselves within the limits of their jurisdiction.*"

*Rex* v. *Moreley*, 2 *Burr.* 1040, was an application to the Court of King's Bench for a writ of *certiorari* to be sent to a justice of the peace to bring up the record of the conviction of certain persons prosecuted under the conventicle act. It was contended that the act, by implication at least, forbid that court from issuing the writ, inasmuch as the act provided " that no other court whatsoever shall intermeddle with any cause or causes of appeal upon this act, but they shall be finally determined in the Quarter Sessions only." From ` this it was argued that the Court of King's Bench could not review the proceedings even by *certiorari*, and hence it would be useless to issue the writ. But the court held that the writ should issue, saying : " A *certiorari does not go to try the merits* of the question, but to see whether the limited jurisdiction have exceeded their bounds." See, also, *Rex* v. *Whitbred*, 2 *Doug.* 549 ; *Rex* v. *Abbott*, reported in note to 2 *Doug.* 553 ; *Anonymous*, 1 *B. & Ad.* 382 ; 20 *E. C. L. R.* 405.

In *Birdsall* v. *Phillips*, 17 *Wend.* 474, recognized and approved

in *Simpson* v. *Rhinelander*, 20 *Wend.* 104, it was distinctly decided that on a return to a common law writ of *certiorari* no other questions can be raised except those relating to the jurisdiction of the officer or court before whom the proceedings are had, and the regularity of such proceedings. The decisions as to the admission or rejection of evidence, or the instructions given to the jury, cannot be reviewed by *certiorari*. The policy of the law creating their summary jurisdictions, is that their decisions on the merits shall be final and conclusive, and if they err upon questions either of law or fact, the parties are without remedy as long as such inferior tribunals keep within the limits of the jurisdiction assigned to them. Cowen, J., in this case uses the following language: "The court below being possessed of the cause, and *prima facie* having jurisdiction and proceeding regularly with its process and continuances, all the rest relates to the merits. These include the evidence offered, its competency and effect, and the charge of the judge, and it is not the office of a common law *certiorari* * * * to bring up such matters for review. This writ is but an emanation from the general supervisory duty of the Supreme Court to restrain the action of all inferior magistrates to matters within their legal grasp." This case also recognized and approved in *Ex parte Mayor of Albany*, 23 *Wend.* 277, where the court, after a review of the cases in New York, says: "The amount of these is that we will not, in any case, on a common law *certiorari*, go beyond the question of power, which is another word for jurisdiction." It is very true that in subsequent cases in that state, the most recent of which is *Clapp* v. *Board of Police*, 72 *N. Y.* 417, the courts of New York have taken a different view of the matter, and have extended the operation of a common law writ of *certiorari* much further than we are disposed to do, and much beyond the limits originally prescribed for it.

The cases in our own state do not decide the question under consideration, though there are passing remarks made in some of them, which seem to support the view contended for by the counsel for the petitioners. But these remarks, besides being mere *dicta*, were evidently not made with any reference to the question we are considering, and are not, therefore, entitled to the weight

which would otherwise be accorded to them.   It seems to us that the proposition contended for by the counsel for the petitioners, that the common law writ of *certiorari* is a substitute for a writ of error, where there is no other remedy provided, and may be used to effect the same purposes, leads necessarily to the conclusion that it is beyond the competency of the legislature to establish an inferior tribunal for any purpose whatever, whose decisions upon the merits of any question, properly within its jurisdiction, should be final and conclusive, and not reviewable through the agency of a writ of *certiorari*, a conclusion which we would be very slow to adopt.

But the question in the case now before us is still narrower than the one we have been considering.   Here the application is to this court, in the exercise of its original jurisdiction, for the writ in question.   The jurisdiction of this court is defined in Section 4 of Article IV. of the constitution, and, as there defined, it embraces four distinct classes of powers: 1. Appellate jurisdiction in "cases of chancery." 2. "The correction of errors at law," under such regulations as the general assembly may prescribe. 3. The power to issue certain specified writs. 4. The power to issue "such other original and remedial writs as may be necessary to give it a general supervisory control over all other courts in the state."   It will be observed that the jurisdiction for the correction of errors at law is not given in general and absolute terms, but only "under such regulations as the general assembly may by law prescribe;" and as it is not pretended that the general assembly has prescribed any regulations by which the errors of any inferior tribunal can be corrected through the medium of a writ of *certiorari*, it would seem to be very clear that such errors cannot be so corrected by this court, and, therefore, however it may be as to the Court of Common Pleas, this court cannot issue a writ of *certiorari* as a substitute for a writ of error.   Then, as to the fourth class, under which the power invoked is claimed to have been conferred.   In this class, too, the power conferred upon this court is not general and absolute, but can only be exercised in such cases as "may be necessary to give it a general supervisory control over all other courts in the state."   Hence, whenever this court is asked to

issue a writ of *certiorari*, (one of the writs embraced in the general terms employed in conferring the fourth class of powers), it is necessary to show : 1. That the writ is to go to one of the *courts* of this state, as was decided in the recent case of *Ex parte Carson*, 5 *S. C.* 117. 2. That such writ is demanded for the purpose of giving this court some "supervisory control" over the court to which it is directed.

In these cases the demand is that the writs of *certiorari* prayed for be directed to "James C. Coit, Esq., commissioner of the Court of Claims," and the question is, whether that tribunal is a court within the sense of that term as used in the constitution. The fact that it is so called in the act constituting it, does not determine the question. Nor is the question to be determined by the nature of the means or instrumentalities it may employ, but rather by the objects which the legislature had in view in creating it, and the scope and effect of its powers. It is undeniable that some of the powers incident to a court have been conferred upon it, but on the other hand it was a tribunal of a temporary character, which did not proceed according to the course of the common law, dispensed with all pleading, was not governed by the rules of evidence which obtain in every court of justice, but, on the contrary, in the language of the act, "the evidence for and against the claim may be brought forward in the usual mode of auditing accounts and under such rules as may be prescribed by the commissioner ; it had no means of enforcing its judgments, and, more than all, it did not render judgment according to the right of the matter, or according to the law and the evidence, but arbitrarily reduced the amount found to be due one-half. It is very clear to our minds that it was not a court in the sense of that term as used in the constitution. The general assembly, in creating it, evidently did not act under the powers conferred in Section 1 of Article IV. of the constitution, but rather under the provisions of Section 4 of Article XIV., which ordains that "the general assembly may direct by law in what manner claims against the state may be established and adjusted." Its object, undoubtedly, was not to create a court in the sense of that term as used in the constitution, but simply a tribunal, more as a board of audit than as a court to inquire into the amount and character

of the unfunded debt of the state, which, but for the magnitude of the matter, might just as well have been referred to one of its own committees, and to prescribe the mode in which such claims against the state should "be established and adjusted."

But, even were we to regard this tribunal as a court, it would still be necessary, as we have seen, to inquire whether the writ is demanded for the purpose of enabling this court to exercise "supervisory control" over such inferior court. To determine this question it will be necessary to inquire what is meant by the terms "general supervisory control," as here used. They certainly do not mean that this court is to correct *any* error into which any inferior court of this state may fall in the exercise of the jurisdiction committed to it, for that would necessarily lead to the conclusion that this court could, through the medium of a writ of *certiorari*, review the findings of fact of any inferior court, a conclusion which no one is willing to adopt. Nor is it reasonable to suppose that the framers of the constitution meant by these words that this court should have power to correct *any errors of law* committed by any of the other courts of the state, for that would be repeating, in the fourth class of powers, the same power already conferred in the second class. These words must, therefore, mean just what the word "control" implies, that this court, through the medium of these writs, is to exercise such a supervision over the other courts of the state as that they may thereby be kept within the limits assigned to them, and no one of them be allowed to overstep its jurisdiction. This, as we have seen, was the office of a writ of *certiorari* at common law, and as one of the rules in construing the constitution is that it should be read in the light of the common law, (*Cooley on Const. Lim.* 60), we find that the construction which we have placed upon these terms in the constitution, instead of antagonizing, harmonize with the common law.

The respondent also takes the position in his return that his action, as set forth in the several petitions, constitutes no error of law. As the writ of *certiorari* is not a writ of right, but grantable only in the sound discretion of the court (1 *Bac. Ab., A,* 349), the writ should not, of course, be granted where the alle-

gation of error, contained in the petition, does not appear to be well founded. While, from the view which we have taken of these cases, it is scarcely necessary to decide this question, yet we may say that we are not satisfied that any error of law is shown in the petitions. The error assigned consists in requiring the petitioners, as holders of warrants known as "Little Bonanzas," to prove the *bona fides* of the original consideration upon which such warrants were based; whereas the petitioners claim that the warrants themselves were sufficient *prima facie* evidence, and until the consideration upon which they rested was assailed by evidence adduced on the part of the state, it was not incumbent upon them to offer any evidence as to such consideration. This question, it will be borne in mind, is to be determined, not by the general rules of evidence obtaining in all courts of justice, but by the special provisions of the acts constituting the tribunal. By the first section of the original act, the object of establishing the tribunal is declared to be "for ascertaining all legal *and just* claims," not merely all legal claims. By the second section it is provided, not that the evidence for and against the claim shall be brought forward according to the usual rules of evidence, but the provision is "the evidence for and against the claim may be brought forward *in the usual mode of auditing accounts, and* under such rules as may be prescribed by the commissioner;" and by the fifth section it is provided that, so far as a certain class of claims against the state (to which class the claims held by petitioners do not belong) are concerned, the warrants drawn by the comptroller-general "shall be deemed sufficient evidence of the claims set forth therein," which, under the maxim *expressio unius exclusio alterius*, would seem to show that the legislature intended that, so far as all other classes of claims were concerned, such warrants should not be deemed sufficient evidence. Then, too, if we are permitted to gather the intention of the legislature which passed the acts in question from the condition of things which rendered it necessary to institute an inquiry into the validity of the debt of the state, it must be apparent to any one who is in the least degree conversant with such condition, that the legislature could not have intended that the inquiry

should be limited to an ascertainment of what claims had been passed and ordered to be paid by the previous legislatures, and warrants given therefor by any of the previous state officials, as such a course would practically defeat the very object of the inquiry, except in reference to that class of claims especially excepted in the fifth section of the act, which had already been subjected to the scrutiny of a tribunal somewhat similar to the one whose conduct is now under review.

From all these considerations, which it is not necessary for us to dilate upon, we are not prepared to say that the commissioner erred in the construction placed by him upon the terms of the original act. But if there were any doubt upon this point that doubt is entirely removed by the provisions of the third paragraph of the first section of the amendatory act, which, in express terms, casts the burden of proof upon the claimant to establish the *bona fides* of the original consideration upon which the claim is based, " except in that class of claims specially mentioned in Section 5 of the original act." It is contended, however, that as this amendment was passed after the claims of the petitioners in these cases had been presented, after their actions had been commenced, so to speak, it cannot alter the rules of evidence in force at that time, so far as these claims are concerned. Without stopping to ascertain the weight to which this argument would be entitled if this were a question arising in one of the *courts* of this state, where the general rules of evidence apply, it is sufficient to say that, as appears by the journal of the general assembly, this question was brought to the attention of that body by the report of the commissioner, and they, simply in the exercise of the power conferred by Section 4 of Article XIV. of the constitution, directed by law in what manner the claims against the state should be established ; and if the petitioners were unwilling to submit to the mode which the general assembly prescribed, by which such claims should be established, all they had to do was to withdraw them, for, at the time of the passage of the amendatory act, these claims had not been adjudicated by the commissioner, and it is only " after adjudication " that the commissioner is directed to cancel the claims.

It seems to us, therefore, that in any view of the question the

petitioners are not entitled to the writs of *certiorari* as prayed for in the petitions. In each of the cases above stated the rule must be discharged and the petition dismissed.

Application refused.

WILLARD, C. J., and HASKELL, A. J., concurred.